

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70148-7-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| RONALD R. BROWN, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | FILED: July 27, 2015 |

SPEARMAN, C.J. — Brown appeals his convictions of two counts each of robbery in the first degree, kidnapping in the first degree, and assault in the second degree and one count of burglary in the first degree on numerous grounds. We agree with him that instructional error requires reversal of the two kidnapping convictions. We also agree that the two assault convictions must be reversed due to a double jeopardy violation. We otherwise affirm and remand with instructions.

## FACTS

In late 2011, Jeff Brinkley and Ethan Mattox were living in a trailer on property adjoining the residence of their friends, Louis and Susan Munson. Their tenancy proved troublesome to the Munsons. Both Brinkley and Mattox were using and selling drugs and their trade often attracted unsavory characters to the Munson property. Drug users and suppliers regularly visited the property at all

hours of the night. 1 Verbatim Report of Proceedings (VRP) at 73-79.[1] In response to this situation, Mr. Munson demanded that he be advised of any visitors to the property before they arrived. The person could either call him directly, or they could call Mattox, who would advise the Munsons of the planned visit.

On one occasion, Kenneth Easley showed up unannounced at the Munson residence. Easley was a middleman who supplied Brinkley and Mattox with methamphetamine, which he, in turn, obtained from the defendant, Ronald Brown. Easley explained to Mr. Munson that he was there to collect a debt owed by Mattox. Mr. Munson told Easley that in the future he should call first and, if Mattox was home, Mattox would arrange to meet Easley at another location.

Nevertheless, on December 1, 2011, Easley again showed up at the Munson home unannounced, claiming that Brinkley and Mattox owed him money. Mr. Munson was angry that Easley had ignored his request to call in advance. The two men nearly came to blows, but Brinkley and Mattox intervened and took Easley into the basement. There they beat him, and robbed him of $4700 in cash, four ounces of methamphetamine and other drugs, a gun, and his jewelry. The men discussed killing Easley, but decided against it. Instead, they drove Easley to one of his friends' house and released him, but kept his car and the other items they had stolen. They did not return to the Munson home.

---

[1] The verbatim report of trial proceedings is contained in seven continuously paginated volumes, dated 1VRP (January 10, 2013), 2VRP (January 11, 2013), 3VRP (January 14, 2013), 4VRP (January 15, 2013), 5VRP (January 16, 2013), 6VRP (January 17, 2013), and 7VRP (January 18, 2013). In this memorandum they are cited by volume and page number.

After his release, Easley telephoned Mr. Munson, asking if he knew what Brinkley and Mattox had done or where they were. Mr. Munson apologized for what had happened to Easley and told him that Brinkley and Mattox were not at the house. Easley's father also called Mr. Munson, threatening retaliation and warning Mr. Munson that "first the boys are coming over, then the real men are going to come over." 1VRP at 98. After these calls, Mr. Munson called Brinkley and Mattox and told them to come home to handle the situation, but they did not return. Mr. Munson also called his wife, who was away at a dinner party, and asked her to pick him up.

Because Brown supplied Easley with the drugs he sold, Easley called him to report what had happened. According to Easley, Brown suggested they arrange a meeting with Brinkley and Mattox. With Brown on the line, Easley called and spoke to the men. Brinkley and Mattox invited Brown and Easley to meet at the Munson home. Before heading to the Munson's, Easley and Brown assembled a group of men at the home of Easley's father to plan their strategy for the meeting. When they left, the group included three men recruited by Brown who were carrying sawed-off shotguns, Kevlar vests and guitar cases loaded with automatic rifles.

Easley testified that the group planned to get his property back and to make "an example" of the people who robbed him. Otherwise, he'd be a "mark," a person that others would take advantage of. 3VRP at 445. Danny Fordham, one of Brown's men, testified that the group decided on a "good cop, bad cop" approach. Fordham testified that he played the "attack dog," while Brown, who

was "the boss," played "the one that was more mellow" and "in control." 5VRP at 759-61. After about an hour of planning, the heavily armed group drove to the Munson house.

Mr. Munson, who had been wary that Easley might return and attempt to retaliate for the incident earlier in the night, was still home alone waiting for his wife. When he noticed the group's three vehicles pull into his driveway, he knew he could not fend them off on his own and decided not to try. Instead, he opened his back door and called out to Easley to "go ahead and come on in. You know, just come on in, you know, I don't want no trouble, you know." 1VRP at 100. Brown entered the house first, wielding a shotgun. He pushed the gun into Mr. Munson's stomach and said, "Brother, if you have a gun tell me now or I'm going to kill you." 1VRP at 107. Brown walked Munson into the living room at gunpoint and ordered him to sit down on the couch. Meanwhile, the rest of the group made sure no one else was home. As Brown looked on, Fordham and another member of the group took Munson's wallet, money, and watch. But when they attempted to take his wedding ring, Brown intervened and stopped them. 1VRP at 118.

Later in the evening, Susan Munson arrived home to find her husband detained on the living room sofa with several armed individuals guarding him and the rest of the house. Brown, who was no longer carrying a firearm, asked her to have a seat with her husband. According to Mrs. Munson, she and her husband were held in their living room for five or six hours. During this time, Brown asked Mrs. Munson what she would do if the cops came. She asked what he wanted

her to do. He answered, "I want you to get rid of them, otherwise, there's going to be two dead cops." 1VRP at 130.

At some point in the evening, Mrs. Munson became worried about her dog and asked Brown if she could bring the animal in from the backyard. Brown gave her permission to do so. Shortly thereafter, she asked Brown for permission to use the bathroom, which he granted. As Mrs. Munson returned to the living room, she heard people in the bedroom going through her things. Brown told them not to take anything from the room, but they did so anyway. She returned to the living room and sat down.

Throughout the group's occupation of the Munson's home, Fordham, played the "bad cop" role. He walked through the house brandishing an assault rifle and making threats. Fordham told the Munsons that if they called the police, he would find someone to kill them. He found and took their address book from the bedroom, as well as their daughter's picture off the wall, which had her name and address on the back. He said that if the Munsons ever said anything, their families would be killed. Mr. Munson, who has a heart condition, testified that he began having heart palpitations and was afraid he would have a second heart attack because "Fordham, the crazy guy, every five minutes is coming up pointing the gun at me accusing me of something, and it's just driving my blood pressure rate up." 1VRP at 121. In an apparent attempt to calm Mr. Munson, Brown told him, "that's [Fordham's] job, he's supposed to be an intimidator." 1VRP at 122. Brown assured Mrs. Munson that the men were not there for them, but they needed to get "ahold of Ethan [Mattox] and Jeff [Brinkley]." Id.

5

During this incident, Brown had Mr. Munson try and call Mattox. Mr. Munson reached Mattox and handed the phone to Brown. After talking on the phone, Brown reported that Mattox and Brinkley were going to be coming back to the Munson home. Mrs. Munson testified that each time the group of assailants thought Brinkley and Mattox were arriving they dimmed the lights and went to designated battle stations in the house. But Brinkley and Mattox never returned.

Patrick Buckmaster, whom Easley had called for backup earlier in the night, did arrive at the Munson house that night, armed with a kitchen knife. He entered the house, apologized for being late, and showed Easley his weapon. Easley introduced Buckmaster to Brown and Fordham, who had come out of a bedroom. Then Buckmaster walked down a hallway out of the living room. About ten minutes later, there was a loud boom, like a gunshot. Mr. Munson thought to himself that one of the assailants might have accidentally fired off a round in the house. Brown immediately told the rest of the group to grab their things and go.

The Munsons remained seated on the sofa. As Brown, Fordham, and the rest of the group were leaving, Fordham pointed his gun at Mr. and Mrs. Munson, told them not to move, and threatened that if they called the police he would return and kill them. The Munsons believed Fordham and were afraid to move for some time after the group had departed. Eventually, Easley called and spoke with Mr. Munson, who testified that Easley told him:

> to look and see if there's a body in the hallway. And I go, what? And he goes, I need you to go look and see if there's a body in the hallway. So I stood up on the couch. I didn't go anywhere, and I can look—I could look through this area and I could see some white tennis shoes and bare legs. And I said, oh, my God, I said, yeah, I said, I think it's your friend [Buckmaster].

6

1VRP at 140. Easley told Mr. Munson that the group would be coming back to take care of the body. The Munsons left their home immediately after the call because they were afraid the group intended to kill them.

Subsequently, Brown, Easley, and Easley's wife returned to the Munson home. Buckmaster, who had been shot in the face, was dead. They wrapped his body in blankets and buried it in the mountains. They also made an extensive effort to remove evidence of the shooting, tearing out carpet, removing blood-stained floorboards, and dismantling part of a wall in the Munson home, then rebuilding everything.

About one month later, when Easley was detained by police for an unrelated incident, he told the officers what had happened at the Munson house. The ensuing investigation resulted in the arrest of eight people, including Brown. Brown was ultimately charged with two counts of first degree kidnapping, two counts of first degree robbery, two counts of second degree assault, one count each for Mr. and Mrs. Munson. He was also charged with one count of first degree burglary. The State also alleged firearm enhancements on each of the seven counts. A jury found Brown guilty as charged. He appeals.

<u>DISCUSSION</u>

Jury Instructions

Brown contends that the "to convict" instruction for the first degree kidnapping charges was improper because it included an alternative means of committing first degree kidnapping that was not charged in the information. We agree.

7

Criminal defendants have the right to be notified of the nature and cause of the accusation against them. See, Wash. Const. art. I, § 22; amend IV U.S. Const.; State v. Kjorsvik, 117 Wn.2d 93, 97, 812 P.2d 86 (1991). This right precludes the State from arguing an alternative means of commission of a crime that is not set forth in the charging information. In the Matter of the Personal Restraint of Brockie, 178 Wn.2d 532, 538, 309 P.3d 498 (2013). An error in offering an uncharged alternative means as a basis for conviction is presumed prejudicial and the State bears the burden of proving it was harmless beyond a reasonable doubt. Id. Such an error requires reversal if it is possible the jury convicted the defendant under the uncharged alternative. State v. Laramie, 141 Wn. App. 332, 343, 169 P.3d 859 (2007).

In this case, the information charged two alternative means of committing first degree kidnapping with respect to each count: abducting a person with intent to facilitate the commission of a felony and abducting a person with intent to inflict extreme emotional distress. See RCW 9A.40.020(1)(b), (d). The jury instructions omitted the first "intent to commit a felony" alternative. Clerk's Papers (CP) at 121,127. However, they included two additional uncharged alternatives: abducting a person with intent to hold the person for ransom or reward and abducting a person with intent to hold the person as a shield or hostage. The State concedes that the instructions improperly included two uncharged alternatives. However, the State contends that the error was harmless. We disagree.

Although the evidence presented to the jury and the State's argument supported conviction under the "intent to inflict extreme emotional distress"

8

alternative means, it also plainly supported conviction under the uncharged "ransom/reward" and "shield/hostage" means. The jury heard testimony that Brown and his accomplices went to the Munson house to get Easley's belongings back from Brinkley and Mattox. When they realized Brinkley and Mattox were not there, they detained the Munsons at gunpoint and had Mr. Munson call Mattox to try and persuade him and Brinkley to come home. This evidence was sufficient to support an inference by the jury that the Munsons were held as ransom for Easley's stolen property or as a shield from any violence Mattox or Brinkley might perpetrate in order to retain the stolen goods.

Moreover, in closing argument, the State urged the jury to find Brown guilty under any of the three alternatives contained in the "to convict" instructions, including the two uncharged alternatives. Specifically, the State argued that Brown and the other participants

> were holding Susan and Chuck ransom for their stuff. They were holding them with the intent to use the fact that they were there to get Ethan and Jeff to come back and give them their stuff. You can use that and say that's a ransom, you can say it's a hostage situation. Either way. If you want to say, oh, it was their stuff, is it really a ransom? It's splitting hairs. They're both there.

7VRP at 984. Based on this record, it is entirely possible that the jury convicted Brown under one of the uncharged alternatives. Accordingly, the error in instructing the jury based on those alternatives was not harmless.

Brown also assigns error to the "to convict" instructions for the first degree robbery charges and the special verdict forms for the firearm enhancements on the same grounds. He points out that according to the information the sole basis for elevating the robbery counts to robbery in the first degree is the allegation that

9

he displayed what appeared to be a firearm. The "to convict" instruction, however, authorizes the jury to convict him of the crime on that basis and also on the uncharged statutory alternative ground that during the course of the crime, he inflicted bodily injury. But because Brown proposed a robbery "to convict" instruction that was identical to the one given by the trial court, he is precluded from challenging the instruction on appeal under the invited error doctrine. As such, we decline to review this issue. State v. Miller, 40 Wn. App. 483, 486, 698 P.2d 1123 (1985).

Brown argues that the invited error doctrine is not a bar to his claim because submission of the offending instruction by his attorney constituted ineffective assistance of counsel. See, State v. Doogan, 82 Wn. App. 185, 188, 917 P.2d 155 (1966). This argument fails because, even assuming his attorney's performance was deficient in this regard, Brown cannot show that he was prejudiced by defense counsel's conduct. See, Id. at 189-90; Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (to prove ineffective assistance of counsel a defendant must show both deficient performance and resulting prejudice); State v. Jeffries, 105 Wn.2d 398, 418, 717 P.2d 722 (1986) (adopting the Strickland test).

To show prejudice in an ineffective assistance of counsel claim, a defendant must show there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Doogan, 82 Wn. App. at 189. "The error of offering an uncharged means as a basis for conviction is prejudicial if it is possible that the jury might have convicted the defendant

under the uncharged alternative" instead of a charged alternative. Id. Brown claims that this is possible here because the State argued that the "bodily injury" element was satisfied by the killing of Patrick Buckmaster during the robbery. But since it was undisputed that Buckmaster died from a gunshot wound perpetrated by one of Brown's accomplices, any juror relying on Buckmaster's death for the "bodily injury" element would also necessarily have found that Brown or one of his accomplices displayed what appeared to be a deadly weapon. Because there is no way a rational juror could find the uncharged "bodily injury" alternative proved in this case without also finding proof of the charged "deadly weapon" alternative, there is no reasonable probability of a different outcome at trial, despite the error.[2] As Brown cannot show prejudice, his ineffective assistance claim fails and his challenge to the robbery "to convict" instruction is barred under the invited error doctrine.[3]

---

[2] For the same reasons, Brown's challenge to the robbery to-convict jury instruction fails even in the absence of invited error. Assuming, arguendo, that he had not proposed the offending instruction, the State has established that the error in including the uncharged "bodily injury" alternative was harmless. See, In re Brockie, 178 Wn.2d at 539 (explaining that, on direct appeal in an uncharged alternative means case, the State has the opportunity to show harmlessness).

[3] We also reject Brown's challenge, in his statement of additional grounds, to the special verdict forms on the ground that they applied the nonunanimity rule overruled in State v. Nunez, 174 Wn. 2d 707, 709, 285 P.3d 21 (2012). The claim is waived on appeal because Brown did not object to the forms at trial. See, State v. Guzman Nunez, 160 Wn. App. 150, 159, 162–63, 248 P.3d 103 (2011), affirmed, 174 Wn.2d 707.

11

## Double Jeopardy

Next, Brown challenges his convictions for second degree assault. He contends that conviction for the assaults in addition to his kidnapping and robbery charges was a double jeopardy violation. We agree.

The double jeopardy provisions of the federal and state constitutions "protect a defendant from being punished multiple times for the same offense." State v. Allen, 150 Wn. App. 300, 312, 207 P. 3d 483 (2009) (citing State v. Adel, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998)). We review claims of double jeopardy violations de novo. State v. Freeman, 153 Wn.2d 765, 770, 108 P.3d 753 (2005).

When considering whether multiple punishments for the same conduct violate double jeopardy, our primary inquiry is whether the legislature intended that multiple punishments be imposed. Freeman, 153 Wn.2d at 771. The merger doctrine provides one basis for ascertaining legislative intent not expressly stated or implicit from the language of the statute.[4] Id. at 772-73; State v. Vladovic, 99 Wn.2d 413, 422, 662 P.2d 853 (1983)). Brown contends that the assault charges in this case merged with either the robbery or kidnapping charges.

As a general rule, the merger doctrine applies "where the Legislature has clearly indicated that in order to prove a particular degree of crime (e.g., first

---

[4] The State suggests that because second degree robbery and third degree assault constitute separate offenses under the "same evidence" Blockburger test, we need not consider the merger doctrine in determining whether a double jeopardy violation exists. See, Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); State v. Calle, 125 Wn.2d 769, 777, 888 P.2d 155 (1995) ("same evidence" test). Because the "same evidence" Blockburger test is merely one of several means of determining legislative intent to impose multiple punishments for the same offense, the argument is not well taken. See, Freeman, 153 Wn.2d at 772.

12

degree rape) the State must prove not only that a defendant committed that crime (e.g., rape) but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes (e.g., assault or kidnapping)." State v. Davis, 177 Wn. App. 454, 460-61, 311 P.3d 1278 (2013) review denied, 179 Wn.2d 1025, 320 P.3d 719 (2014) (quoting Vladovic, 99 Wn.2d at 421). In determining whether crimes merge, we do not focus narrowly on the express designation of various degrees of a crime in the criminal statutes. Rather, we inquire as to the "manner in which the offenses are charged and proved in a particular case and whether the State was required to prove the act constituting the merging crime to elevate the other crime."[5] Id. at 463. Thus, the essential inquiry in our merger analysis here is whether the kidnapping and robbery charges required proof of the same conduct that formed the basis for the assault charges.

The information charged two alternative means of committing first degree kidnapping with respect to each count: abducting a person with intent to facilitate commission of a felony and abducting a person with intent to inflict extreme emotional distress. See RCW 9A.40.020(1)(b)(d). The jury was instructed that, to-convict, it must find beyond a reasonable doubt that the defendant or an accomplice intentionally abducted the Munsons. It was also instructed that to "[a]bduct means to restrain a person by using or threatening to use deadly force." CP at 121, 123, 127. And the State presented ample evidence that Brown and

---

[5] Accordingly, we have held that a second degree assault that elevates unlawful imprisonment to second degree kidnapping merges with the kidnapping charge. State v. Davis, 177 Wn. App. at 460-61.

his accomplices repeatedly pointed their guns at the Munsons and threatened them with deadly force. Thus, as charged and proved in this case, the kidnapping charges involved proof of second degree assaults.[6]

With respect to the first degree robbery charges, the information alleged:

> That the defendant, on or about the 1st day of December, 2011, with intent to commit theft, did unlawfully take personal property of another...from the person or in the presence of [the Munsons]...against [the Munsons'] will, by use or threatened use of immediate force, violence, and fear of injury...and in the commission of said crime and in immediate flight therefrom, the defendant was armed with a deadly weapon and displayed what appeared to be a firearm or other deadly weapon; proscribed by RCW 9A.56.200, a felony; and that at the time of the commission of the crime, the defendant or an accomplice was armed with a firearm, as provided and defined in RCW 9.94A.533(3), RCW 9.41.010, and RCW 9.94A.825.

CP at 925-26.

The jury was instructed that, to convict, it must find, among other elements, that "the defendant or an accomplice unlawfully took personal property from the person or in the presence of [the Munsons]," that "the taking was against [the Munsons'] will by the defendant's use or threatened use of immediate force, violence, or fear of injury," and that "in the commission of these acts or in immediate flight therefrom the defendant or an accomplice was armed with a deadly weapon," "displayed what appeared to be a firearm or other deadly

---

[6] Washington courts recognize three definitions of assault: "(1) an attempt, with unlawful force, to inflict bodily injury upon another [attempted battery]; (2) an unlawful touching with criminal intent [actual battery]; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is capable of inflicting that harm [common law assault]." State v. Wilson, 125 Wn. 2d 212, 218, 883 P.2d 320, 323 (1994).

Under RCW 9A.36.021(1), "A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:... (c) Assaults another with a deadly weapon." No Washington statute defines the term "assault."

14

weapon," or inflicted bodily injury. CP at 133.

The court's instruction sets forth several statutory alternative means to convict for first degree robbery.[7] But, the State clearly elected the "deadly weapon" alternatives in particular. The narrow language of the charging information indicates that the State was relying on the "deadly weapon" alternatives. And the State provided evidence in support of these alternatives in the form of testimony from multiple witnesses that Brown and/or his compatriots threatened the Munsons with guns as they stole Mr. Munson's personal belongings and ransacked the house. Thus, as charged and proved, the robberies in this case involved second degree assaults in furtherance of them.

The State concedes that the basic requirements for merger are present in this case, but argues that a double jeopardy problem is avoided here under an exception to the merger doctrine that applies where two offenses involve injury to the person or property of the victim or others that is separate and distinct from and not merely incidental to the crime of which it forms an element. See, Freeman, 153 Wn. 2d at 778. This exception will "allow two convictions even when they formally appear to be the same crime under other tests." Id. For example, if a defendant struck the victim after completing a robbery, there was a

---

[7] Under RCW 9A.56.200:

(1) A person is guilty of robbery in the first degree if:
    (a) In the commission of a robbery or of immediate flight therefrom, he or she:
    (i) Is armed with a deadly weapon; or
    (ii) Displays what appears to be a firearm or other deadly weapon; or
    (iii) Inflicts bodily injury; or
    (b) He or she commits a robbery within and against a financial institution
    . . . .

15

separate injury and purpose justifying a separate assault conviction, because the assault did not further the robbery. State v. Knight, 176 Wn. App. 936, 952-53, 309 P.3d 776 (2013) review denied, 179 Wn.2d 1021, 318 P.3d 279 (2014); State v. Prater, 30 Wn. App. 512, 516, 635 P.2d 1104 (1981).

In its oral ruling at Brown's sentencing hearing, the trial court agreed with the State. It found that the second degree assault charges against Brown stemmed from Fordham's act of pointing his gun at and threatening the Munsons as the group exited the Munson residence. The court found that this act was committed in an effort to prevent the Munsons from reporting the crimes to police rather than in furtherance of the robbery or the kidnapping and thus, distinguishable from the many other assaults that occurred during the course of the evening. In the trial court's view, Fordham's final assaults involved a purpose and injury to the victims that was separate and distinct from the kidnappings and robberies, and thus the crimes did not merge.

But even if we accept the trial court's conclusion, it is insufficient to cure the double jeopardy violation here. At issue is whether the evidence, arguments of counsel, and jury instructions made it "'manifestly apparent to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act. . . ." State v. Mutch, 171 Wn.2d 646, 664, 254 P.3d 803 (2011) (quoting State v. Berg, 147 Wn. App. 923, 931, 198 P.3d 529 (2008). They did not.

The evidence regarding Fordham's last assault did not naturally segregate itself from the previous assaults. The jury was not instructed on the need to find

that each count arises from a separate and distinct act in order to convict. And the State did not argue that Fordham's assault on the Munsons as he left their house was the specific criminal act that constituted second degree assault, as opposed to any of the other assaults committed by Brown and his accomplices that night. Because there was no basis for the jury to distinguish between the many assaults committed by Brown and his accomplices and the assaults were the basis for elevating the kidnapping and robbery charges to first degree, we conclude the assault convictions violated double jeopardy. Accordingly, on remand we direct the trial court to enter orders vacating those conviction and resentence Brown. See, State v. Weber, 159 Wn.2d 252, 269, 149 P.3d 646 (2006) (explaining that the remedy for a double jeopardy violation is to vacate the offense carrying the lesser sentence).

Sufficiency of the Evidence

Brown challenges the sufficiency of the evidence supporting his first degree robbery and first degree burglary convictions.[8] In reviewing a challenge to the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. Id.

---

[8] He also challenges his first degree kidnapping convictions on this basis. However, since we vacate those convictions on other grounds, we do not address his challenge to the sufficiency of the evidence here.

17

As to the two counts of first degree robbery, the State charged Brown based on a theory of accomplice liability, the requirements of which are set out in RCW 9A.08.020(3) as follows:

> A person is an accomplice of another person in the commission of a crime if:
> (a) With knowledge that it will promote or facilitate the commission of the crime, he or she:
> (i) Solicits, commands, encourages, or requests such other person to commit it; or
> (ii) Aids or agrees to aid such other person in planning or committing it; . . .

These requirements were set out for the jury in Instruction 10. Brown contends the State failed to meet its burden of establishing he was an accomplice to the robberies in this case, claiming that he was just a bystander to the robberies, with no intent to facilitate, aid, or abet those crimes. He also claims his admonitions to his cohorts that they should not take anything from the Munsons is evidence that he did not share their intent to commit the robberies.

But there was significant countervailing evidence in this case. Easley and Fordham testified that Brown and his accomplices spent nearly an hour planning the events that unfolded at the Munson home, with the notable exception of the shooting of Patrick Buckmaster. Fordham testified that Brown deliberately played the "good cop" to his "bad cop" in order to facilitate their plan. Fordham and Easley also testified that the group recognized Brown as their leader, who controlled the movements of both his accomplices and the victims. This testimony was corroborated by Mr. Munson, who testified that other members of the group followed Brown's order not to take his wedding ring, and Mrs. Munson, who testified that she had to get Brown's permission to bring her dog inside and

use the bathroom. Given this evidence, a reasonable jury could infer that Brown was not merely a bystander to the robberies, but an active party who knew of the crimes being committed and took action to facilitate their commission. Viewed in the light most favorable to the State, the evidence is sufficient to support the jury's finding that Brown was guilty as an accomplice of both counts of first degree robbery.

In a statement of additional grounds (SAG) for Appeal, Brown also challenges the sufficiency of the evidence supporting his first degree burglary conviction. To convict Brown as charged, the State bore the burden of proving he or an accomplice entered or remained in a building unlawfully with intent to commit a crime against a person or property therein and, while in the building or in immediate flight therefrom, was armed with a deadly weapon. See also, RCW 9A 52.020; State v. Gohl, 109 Wn. App. 817, 823, 37 P.3d 293 (2001). Entry is unlawful if made without invitation, license, or privilege. Gohl, 109 Wn. App. at 823.

Brown contends that there was no unlawful entry here because Brinkley and Mattox had invited him and Easley to the Munson home in order to discuss conciliation. However, it is undisputed that Brinkley and Mattox neither owned nor resided in the Munson home. Instead, they were boarders in a trailer located elsewhere on the Munsons' property. And there was no evidence presented at trial that Brinkley and Mattox had any right of access in the Munson home, let alone the authority to invite others onto the property. On the contrary, Mr. Munson testified that Brinkley and Mattox were not allowed to have any visitors

19

to the property without his prior knowledge and approval. Thus, Brown's argument lacks merit.

Brown also argues that Mr. Munson personally invited him and the rest of the group in after they arrived on his property. But Mr. Munson testified that Brown arrived wielding a shotgun and as he entered the house, he pushed the weapon into Mr. Munson's stomach. He also testified that he did not want Brown or his accomplices there and only invited them to enter, in an effort to deescalate a potentially violent situation. Under these circumstances, no reasonable juror could conclude that a reasonable person would believe Mr. Munson's "invitation" was the product of his own free will.

We conclude there was ample evidence to support the jury's finding that Brown's entry into the Munson home was unlawful. Because that is the only basis upon which Brown argues the evidence is insufficient, we reject his challenge to the jury's guilty verdict on the charge of burglary in the first degree.

## Prosecutorial Misconduct

Brown claims he was denied a fair trial due to repeated instances of misconduct by the prosecutor throughout the proceeding. We engage in a two-part analysis of a prosecutorial misconduct claim. First, we determine whether the defendant has established that the prosecutor's conduct was improper. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012) (citing State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011)). Next, we determine whether the defendant was prejudiced by the misconduct under one of two standards of review. Id. at 760. If the defendant objected at trial, he must show that the

20

misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Id. (citation omitted). If the defendant did not object, he is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. Id. at 760-61 (citing State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). In that case, the defendant must show that: (1) no curative instruction would have obviated any prejudicial effect on the jury; and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. Id. (citing Thorgerson, 172 Wn.2d at 445)). In assessing whether the alleged misconduct requires reversal, we review the improper statements in the context of the entire case. Thorgerson, 172 Wn.2d at 443 (citing State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).

In this case, Brown contends that the prosecutor's explanation of accomplice liability as "in for a penny, in for a pound" during closing arguments was misconduct. 7VRP at 990-91. The State concedes that the argument was improper, as it misstates the law of accomplice liability. See, State v. Roberts, 142 Wn.2d 471, 510-13, 14 P.3d 713 (2000); State v. Cronin, 142 Wn.2d 568, 579, 14 P.3d 752 (2000). However, we agree with the State that Brown's misconduct claim is waived because the argument was not flagrant or ill-intentioned and could have been cured by an instruction to the jury.

Brown cites State v. Fleming, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996), for the proposition that a misstatement of established law is per se flagrant and ill-intentioned misconduct. But his reliance on the case is misplaced,

21

as our holding was limited to improper comments regarding the role of the jury and the burden of proof. Because the prosecutor's statements in this case do not concern either issue, Fleming is inapposite.

Moreover, even if the prosecutor's improper argument was flagrant and ill-intentioned, there is nothing in the record to suggest that the jury would have been unable or unwilling to follow a curative instruction containing the correct law had the trial court provided one. See, State v. Swan, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990), (explaining the presumption that the jury will follow the court's instructions to disregard an improper argument). Because Brown fails to establish that the prosecutor's improper argument was incurable and prejudicial, he has waived his right to challenge it on appeal.

And we find no merit in Brown's claim that this waiver is the result of ineffective assistance of counsel. In order to prevail on an ineffective assistance of counsel claim, a defendant must show that his trial attorney's performance was deficient and that he was prejudiced as a result. Strickland, 466 U.S. at 687; Jeffries, 105 Wn.2d at 418. Here, even if Brown could establish that defense counsel's failure to object to the prosecutor's arguments was an oversight rather than a strategic decision, he cannot show that he was prejudiced by his attorney's performance. The jury was expressly instructed to disregard any argument that was not supported by the law in the court's instructions, which, unlike the State's closing argument, set out the proper requirements for accomplice liability. And it is presumed to have disregarded the prosecutor's

22

arguments insofar as they contradicted the court's instructions. See, e.g., Emery, 174 Wn.2d at 764; State v. Imhoff, 78 Wn. App. 349, 352, 898 P.2d 852 (1995).

In his SAG, Brown claims several other statements made by the prosecutor constitute misconduct and we have considered each of them.[9] But even if we assume that each statement was improper, the claims must still fail. Brown did not object to the statements[10] and he does not explain how the statements were so flagrant and ill-intentioned that any prejudice from the alleged error was incurable with a proper instruction. Moreover, even assuming some prejudice resulted from the alleged errors, the record does not show that it had any likelihood of affecting the verdict.[11]

## CrR 4.7 Protective Order[12]

Brown argues that the trial court erred when it granted the State's request

---

[9] Brown claims the following comments by the State were improper: (1) referring to Patrick Buckmaster as "the victim" during examination of one of the State's witnesses; (2) arguing that shooting Buckmaster could satisfy the "bodily injury" requirement for first degree robbery; (3) in explaining the knowledge requirement of unlawful imprisonment the prosecutor said "if you accidentally locked someone in a room it wouldn't be a crime because you wouldn't have done it knowingly." 7VRP at 985; (4) "[y]ou know don't look at a dog when it's about to – you know when it's aggressive towards you." 7VRP at 996; (5) arguing that Fordham enjoyed playing the role of enforcer; 6) arguing that Mr. Munson's testimony that he feared reprisal for the assault on Easley was believable; 7) allegedly misrepresenting facts in order to obtain a continuance of the trial date.

[10] We note, however, that Brown did object to the prosecutor's attempt to explain to the jury why Buckmaster's death was not a homicide under Washington law. Although the court sustained the objection, Brown did not request a curative instruction and none was given. And Brown fails to explain how the irrelevant comment resulted in prejudice that had a substantial likelihood of affecting the verdict.

[11] We also reject Brown's argument that his attorney provided ineffective assistance when he failed to object to the prosecutor's alleged improper comments. In light of the overwhelming independent evidence of Brown's guilt, even assuming the comments were improper, they were unlikely to affect the outcome of trial. Thus, Brown cannot establish the prejudice prong of his ineffective assistance claim. See, Jeffries, 105 Wn.2d at 418; Strickland, 466 U.S. at 687.

[12] The remaining arguments were asserted by Brown in his statement of additional grounds.

23

for a protective order and order enjoining disclosure of certain records. We disagree.

As a general rule, a prosecutor is obliged to disclose to the defendant any documents which the prosecutor intends to use in trial. CrR 4.7(a). However,

> Upon a showing of cause, the court may at any time order that specified disclosure be restricted or deferred, or make such other order as is appropriate, provided that all material and information to which a party is entitled must be disclosed in time to permit the party's counsel to make beneficial use thereof.

CrR 4.7(h)(4)(Protective Orders). We review a trial court's discovery order for abuse of discretion. T.S. v. Boy Scouts of America, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006).

In this case, the records subject to the protective order were documents related to pending federal charges against Easley and Fordham and related plea negotiations, all arising from the incident at the Munson residence. The trial court had authority under CrR 4.7(h)(4) to enter an order limiting disclosure of these sensitive records. Moreover, because the express terms of the order required the State to provide Brown's defense attorney with a copy of the protected documents, Brown's argument that the order violated his right to disclosure of evidence is unfounded.

### Evidentiary Rulings

In his SAG, Brown assigns error to several of the trial court's evidentiary rulings. We review for an abuse of discretion. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999).

24

First, Brown challenges, ostensibly on relevance grounds, the trial court's admission of exhibits 84 and 85, respectively, a firearm and bullet proof vest discovered in Fordham's possession when he was arrested some three months after the incident at the Munson house. He also challenges the trial court's admission of Mrs. Munson's statement that Brown told her there would be "two dead cops" should she fail to get rid of any investigating police officers. Because Brown did not object to this evidence at trial, the alleged errors have not been preserved for review.[13] ER 103(a)(1); State v. Adams, 138 Wn. App. 36, 155 P.3d 989 (2007).

Next, Brown assigns error to the trial court's admission of several photographs related to the investigation of the shooting of Patrick Buckmaster. Brown objected to the photos before trial on the grounds that the evidence was irrelevant and unfairly prejudicial. The trial court admitted the evidence over Brown's objection, reasoning that it was probative of whether one of the firearms used in the incident was operational, an essential element of the firearm enhancements, as well as Brown's consciousness of guilt. We agree with the trial court's reasoning and find no abuse of discretion. See RCW 9.41.010(9) (defining "firearm" as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder.")

---

[13] In his SAG, Brown contends that his attorney rendered ineffective assistance by failing to object to these items of evidence. But even if Brown can establish that his attorney's performance was deficient, given the weight of the evidence against him, there is no reasonable probability that the jury would have returned a different verdict but for the admission of the objectionable evidence. Because he cannot show prejudice, his ineffective assistance claims fail. See, Jeffries, 105 Wn.2d at 418; Strickland, 466 U.S. at 687.

Brown also assigns error to the trial court's failure to give a limiting instruction to the jury with regard to evidence of Buckmaster's shooting. This claim fails because, since Brown did not request such instruction, the trial court had no duty to give one. ER 105; State v. Noyes, 69 Wn.2d 441, 446-47, 418 P.2d 471 (1966); accord, State v. Russell, 171 Wn.2d 118, 123-24, 249 P.3d 604 (2011) ("Since Noyes, this court has continued to hold that absent a request for a limiting instruction, the trial court is not required to give one sua sponte.") (Citing State v. Athan, 160 Wn.2d 354, 383, 158 P.3d 27 (2007)).

Finally, Brown assigns error to the trial court's ruling that Mr. Munson's 1980 and 1989 armed robbery convictions were inadmissible as impeachment evidence. We conclude that the ruling was not an abuse of discretion. ER 609 allows prior convictions for the purpose of impeaching a witness's credibility, subject to a time limit of ten years from the latter of conviction or release from confinement. Here, Brown indicated his intent to use the convictions to demonstrate Mr. Munson's propensity for armed robbery and inculpate him in the attack on Easley that led to the events of this case. This is an improper purpose under ER 609(a). Furthermore, both convictions were well beyond the 10 year time limit imposed by ER 609(b). The trial court's decision to exclude the convictions was not error.

Speedy Trial

The Sixth Amendment to the U.S. Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant a speedy and public trial. Brown claims that the numerous continuances in this case violated this right.

26

We review his claim de novo. State v. Iniguez, 167 Wn.2d 273, 280, 217 P.3d 768 (2009).

In determining whether a delay violates a defendant's speedy trial rights, our first step is a fact-specific inquiry as to whether a delay is presumptively prejudicial. Id. Our Supreme Court has explained that the length of delay, the complexity of the charges, and the reliance on eyewitness testimony are all factors to be considered. Id. In this case, these factors do not support a finding that the delay was presumptively prejudicial. The charges arose from a criminal enterprise involving no fewer than eight criminal actors. During the pretrial phases, many of the eight codefendants and their multiple attorneys were engaged in ongoing negotiations with the State regarding whether they would testify or accept plea agreements. And at least two of the codefendants were simultaneously defending federal charges. In light of these circumstances, the roughly eleven month delay in commencing trial was not presumptively prejudicial.

Even if Brown could show a presumptively prejudicial delay, under the Barker[14] test adopted by our Supreme Court in Iniguez, he still fails to establish a speedy trial violation that warrants dismissal with prejudice. The Barker analysis "involves a more searching examination of the circumstances, including the length of and reasons for delay, whether the defendant asserted his speedy trial rights, and prejudice to the defendant." Iniguez, 167 Wn. 2d at 292.

---

[14] Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

27

In this case, the Barker factors do not weigh in favor of dismissal. Although Brown spent the delay in prosecuting his case in custody, much of the delay was necessitated by the ongoing negotiations with Brown's codefendants, as well as the need for defense counsel to prepare for trial. Brown's argument that the delays were the result of misconduct and false statements by the prosecutor is not borne out by the record. One of the continuances was requested by Brown's attorney and another by his codefendants. The court granted both over Brown's objection. The remaining continuances were granted on the State's motion, again over Brown's objection. Those continuances were necessary as part the State's effort to try the codefendants together, secure the attendance of its witnesses, and resolve scheduling conflicts. Brown's cites nothing in the record to support his claim that the State's continuance requests were made to intentionally interfere with his speedy trial rights. And although Brown argues that the delay presumptively prejudiced his right to a fair trial, he does not show that the delay caused him to lose potential testimonial or other evidence.

As in Iniguez, we conclude "[t]he trial court had good reasons for granting each of the continuances...and acted within the constitutional limits in balancing the competing interests of trying the codefendants jointly, accommodating trial preparation and scheduling concerns, and securing the defendant's constitutional rights." Id. at 295-96. Brown's right to a speedy trial was not violated.

28

## Right to Present and Confront Witnesses

Under the State and federal constitutions an accused has the right to confront adverse witnesses and to compulsory process to compel the attendance of witnesses on his or her own behalf. Wash. Const. art. I, § 22; U.S. Const. amend VI. Brown claims the trial court violated these rights, but the argument is not borne out by the record.

Contrary to Brown's assertions, the trial court did not preclude the testimony of all of his witnesses. The testimony of Howard Coleman, Brown's expert on the DNA testing methodology used by the state crime lab, was allowed. But Brown elected not to call him, presumably because his expected testimony largely duplicated that of the State's DNA expert. The trial court did exclude four of Brown's proposed witnesses, Shawana Fly, Simone Lyons, Tom Jackson, and Carol Davis. But because it is evident from the record that these witnesses only purported to offer impeachment on collateral matters, the ruling was well within the trial court's discretion. State v. Oswalt, 62 Wn.2d 118, 120, 381 P.2d 617, 618 (1963). Finally, to the extent Brown asserts he intended to call any other witnesses or testify himself, he expressly declined to do so during a colloquy with the trial court on the matter before resting his case.

## Conclusion

We reverse the kidnapping convictions and remand for retrial. Should the issue arise on remand, we note that the "mandatory joinder rule" precludes the State from amending the information to include the alternative means that were

not originally charged.[15] State v. Russell, 101 Wn.2d 349, 352-53, 678 P.2d 332 (1984); CrR 4.3.1(b)(3). We also reverse the assault convictions and remand with instructions that the trial court enter orders vacating these convictions and for resentencing.

WE CONCUR:

Spearman, C.J.

Trickey, J.

Appelwick, J.

---

[15] CrR 4.3.I(b)(3) provides:

A defendant who has been tried for one offense may thereafter move to dismiss a charge for a related offense, unless a motion for consolidation of these offenses was previously denied or the right of consolidation was waived as provided in this rule. The motion to dismiss must be made prior to the second trial, and shall be granted unless the court determines that because the prosecuting attorney was unaware of the facts constituting the related offense or did not have sufficient evidence to warrant trying this offense at the time of the first trial, or for some other reason, the ends of justice would be defeated if the motion were granted.

Two offense are "related offenses" for purposes of the rule "if they are within the jurisdiction and venue of the same court and are based on the same conduct." CrR 4.3.I(b)(1). Statutory alternative means of committing the same crime are "related offenses" for purposes of the rule. Russell, 101 Wn.2d at 352.